UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                      :

SECURITIES INVESTOR PROTECTION    :
CORPORATION,                                 :
                                        :

                       Plaintiff-Applicant,  :          20-CV-2872 (VSB)
                                        :

                     - against -         :        **OPINION & ORDER**
                                        :

                                        :

BERNARD L. MADOFF INVESTMENT   :
SECURITIES LLC,                          :
                                        :

                          Defendants.  :
-------------------------------------------------------X
                                        :

                                        :

In re: BERNARD L. MADOFF,          :
                                        :

                                Debtor,  :
                                        :
-------------------------------------------------------X
                                        :

IRVING H. PICARD, *Trustee for the*   :
*Substantively Consolidated SIPA Liquidation*  :
*of Bernard L. Madoff Investment Securities*  :
*LLC and Bernard L. Madoff*,         :

                                  Plaintiff,  :

                     - against -         :

                                        :

ZIESES INVESTMENT PARTNERSHIP,  :
MARSHALL ZIESES, DEBRA S. ZIESES,  :
NEIL R. ZIESES, CARYN ZIESES, BARRY :
INGER, ALLAN INGER, and SUSAN B.  :
ALSWANGER,                          :
                                        :

                          Defendants.  :
-------------------------------------------------------X

<u>Appearances</u>:

David J. Sheehan
Nicholas J. Cremona
Baker & Hostetler LLP
New York, New York
*Counsel for Plaintiff*

Anthony Alexander Mingione
Philippe Marc Salomon
Blank Rome LLP
New York, New York

Helen Davis Chaitman
Chaitman LLP
New York, New York
*Counsel for Defendants*

<u>VERNON S. BRODERICK, United States District Judge</u>:

    This case arises from the Bernard L. Madoff ("Madoff") Ponzi scheme and the

subsequent consolidated liquidation of his investment company, Bernard L. Madoff Investment

Securities LLC ("BLMIS LLC" or the "LLC"), pursuant to the Securities Investor Protection

Act, 15 U.S.C. §§ 78aaa–78lll ("SIPA").  Plaintiff Irving H. Picard (the "Trustee"), as Trustee

for the liquidation of BLMIS LLC, seeks to recover funds transferred from BLMIS LLC to

Defendant Zieses Investment Partnership ("Zieses" or the "Partnership") and seven of its general

partners,[1] (together with Zieses, the "Defendants").  Before me are the parties' cross motions for

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Because I find

that there is no genuine dispute as to Defendants' liability and that Plaintiff is entitled to

judgment as a matter of law, Plaintiff's motion is GRANTED, and Defendants' motion is

DENIED.

---

[1] The general partners of Zieses are Marshall Zieses, Debra S. Zieses, Neil R. Zieses, Caryn Zieses, Barry Inger,
Allan Inger, and Susan B. Alswanger.

## I.     Factual Background[2] and Procedural History

The facts underlying this case, and its many predecessors, "are well documented across many pages of Federal Reporters."  *In re Bernard L. Madoff Inv. Sec. LLC*, 976 F.3d 184, 188 (2d Cir. 2020) ("*Gettinger*").  I assume familiarity with the general background of Madoff's Ponzi scheme and recount the facts only briefly here as necessary for this Opinion & Order.  *See Picard Tr. for SIPA Liquidation of Bernard L. Madoff Inv. Sec. LLC v. JABA Assocs. LP*, 49 F.4th 170, 176 (2d Cir. 2022) ("*Jaba II*") ("The litigation stemming from the Ponzi scheme Madoff ran through BLMIS, his broker-dealer firm, is well-known to this Court.").

### A.  *Madoff's Business and Change in Organization*

In January 1960, Madoff registered as a broker-dealer with the Securities and Exchange Commission ("SEC") and was assigned registrant number 8-8132.  (Pl.'s 56.1[3] ¶ 7.)  Using this registration, Madoff became a member of the Securities Investor Protection Corporation (the "SIPC") when SIPA was enacted in 1970.  (*Id*; Cremona Decl.[4] Ex. 1.)  Beginning in about the 1970s to January 1, 2001, Madoff operated his business as a sole proprietorship under the trade name "Bernard L. Madoff Investment Securities" ("Madoff Securities").  (Pl.'s 56.1 ¶ 8; Defs.' 56.1[5] ¶ 8; Dubinsky Report[6] ¶ 36.)  Madoff Securities operated as three business units:  (1) a

---

[2] The statements of fact set forth in this section are undisputed unless noted otherwise.  Although the parties dispute the usage of certain terms and the admissibility of certain documents on which these statements of facts rely, they do not object to the substance of these statements.

[3] "Pl.'s 56.1" refers to the Trustee's statement of material facts, filed in support of his motion for summary judgment.  (Doc. 11.)

[4] "Cremona Decl." refers to the June 22, 2020 declaration of Nicholas J. Cremona, filed in support of the Trustee's motion for summary judgment.  (Doc. 13.)

[5] "Defs.' 56.1" refers to Defendants' counter statement of material facts, filed in support of their memorandum of law in opposition to the Trustee's motion for summary judgment and in support of their cross motion for summary judgment.  (Doc. 18.)

[6] "Dubinsky Report" refers to the January 16, 2019 expert report of Bruce G. Dubinsky, annexed as attachment A to the declaration of Bruce G. Dubinsky ("Dubinsky Decl."), filed in support of the Trustee's motion for summary judgment.  (Doc. 12.)

proprietary trading business, which traded for its own account to make money for the business; (2) the market making business, which made markets in certain stocks, bonds, warrants and rights; and (3) the investment advisory business ("IA" or "IA Business"), which was designed to trade stocks, buy equities, and to buy options on behalf of its customer accounts.  (Pl.'s 56.1 ¶¶ 15–17; Defs.' 56.1 ¶ 1; Dubinsky Report ¶¶ 36, 41–44.)  The proprietary trading business and the IA Business were both operated by Madoff Securities.  (Pl.'s 56.1 ¶ 18; Dubinsky Report ¶¶ 36, 48.)

In 2001, Madoff reorganized Madoff Securities, forming a single member limited liability company, BLMIS LLC.  (Pl.'s 56.1 ¶ 9.)  On January 12, 2001, Madoff filed an amended SEC Form BD.  (Pl.'s 56.1 ¶ 9; Defs.' 56.1 Resp. ¶ 9; Cremona Decl. Ex. B ("Am. Form BD".)  Under the section of the Form BD where BLMIS LLC was required to indicate "types of business engaged in," three types were checked:  (1)"Broker or dealer making inter-dealer markets in corporate securities over-the-counter," (2) "Trading securities for own account," and (3) others.  (*See* Am. Form BD 8–9.)  The type "Investment Advisory Services" was not checked.[7]  Although the parties dispute whether the IA Business was transferred to BLMIS, it is undisputed that Madoff listed BLMIS LLC as the "successor" to Madoff Securities, and when asked to describe the details of the succession, stated as follows:  "Effective January 1, 2001, predecessor will transfer to successor all of predecessor's assets and liabilities, related to predecessor's business.  The transfer will not result in any change in ownership or control."  (Defs.' 56.1 Resp. ¶ 10; Am. Form BD 11.)  Madoff further attested that no "accounts, funds, or

---

[7] Form BD does not require the applicant to check "any category that accounts for . . . less than 1% of annual revenue from the securities or investment advisory business."  (Am. Form BD 8.)  The Trustee does not argue that the investment advisory business accounted for less than 1% revenue of BLMIS LLC.

securities of customers of the applicant are held or maintained by such other person, firm, or organization."  (Am. Form BD at 6.)

Two commercial business accounts at JPMorgan Chase Bank, N.A. ("JPMorgan")— account #xxxxx1703 (the "703 Account") and account # xxxxxxxxx1509 (the "509 Account," together, the "JPMorgan Accounts")—were two of the accounts primarily used by the IA Business.  (Pl.'s 56.1 ¶ 69; Dubinsky Report ¶ 340 n.285.)  The IA Business customers' money was deposited into the 703 Account, and the IA Business customers' withdrawals were effectuated through the 509 Account.  (*Id.* ¶¶ 70–72.)

On December 11, 2008, Madoff was arrested and charged with violating federal securities laws.  (*Id.* ¶ 1.)  The SEC, contemporaneously, commenced an action in this Court alleging civil violations of the federal securities laws.  (*Id.*)  Approximately three months later, on March 12, 2009, Madoff pled guilty to 11 counts of securities fraud and money laundering. (*See* Madoff Allocution[8] 8:21–9:12.)  During Madoff's guilty plea allocution, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [his] business, Bernard L. Madoff Securities LLC."  (*Id.* 23:15.)  Specifically, he admitted that:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options, and other securities of large well-known corporations, and upon request, would return to them their profits and principal. Those representations were false for many years. Up until I was arrested on December 11, 2008, I never invested these funds in the securities, as I had promised.  Instead, those funds were deposited in a bank account at Chase Manhattan Bank.  When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase

---

[8] "Madoff Allocution" refers to the allocution of Bernard L. Madoff on March 12, 2009 before then-District Judge Denny Chin, filed as an exhibit to the Cremona Declaration in support of the Trustee's motion for summary judgment.  (Doc. 13, Ex. 5.)

Manhattan bank account that belonged to them or other clients to pay the requested funds.

(*Id.* 24:9–22.)

### B. *Substantive Consolidation*

Four days after Madoff's arrest, on December 15, 2008, the SEC consented to combining its action with an application for a protective decree by SIPC, pursuant to 15 U.S.C. § 78eee(a)(4)(B).  (Pl.'s 56.1 ¶ 3.)  The SIPC application alleged, among other things, that BLMIS LLC could not meet its obligations to securities customers as they came due and that its customers needed the protections afforded by the SIPA.  (Pl.'s 56.1 ¶ 3; App. of SIPC at 10, *SEC v. Madoff*, No. 08-CV-10791 (S.D.N.Y. Dec. 15, 2008), Doc. 5.))  That same day, the court entered an order granting SIPC's application and appointing the Trustee for the liquidation of BLMIS LLC, appointing Baker & Hostetler LLP as counsel to the Trustee, and removing the case to the Bankruptcy Court.  (*Id.* ¶ 4.)  The court also ordered that Madoff's creditors could initiate an involuntary bankruptcy proceeding against Madoff so that a Chapter 7 trustee could target "that portion of Mr. Madoff's property that is neither forfeitable criminally nor subject to the liquidation of BLMIS [LLC] under SIPA."  (Order at 3–4, *SEC v. Madoff*, No. 08-CV-10791 (S.D.N.Y. Apr. 10, 2009), Doc. 47.)

On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff.  (Pl.'s 56.1 ¶ 6 (citing Involuntary Petition, *In re Bernard L. Madoff*, Adv. Pro. No. 09-11893 (SMB) (Bankr. S.D.N.Y. Apr. 13, 2009), Doc. 1).)  On June 9, 2009, the Bankruptcy Court substantively consolidated the SIPA liquidation and the Chapter 7 bankruptcy.  (*Id.* (citing *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 10, 2009), Doc. 252 ¶ 3) (the "Substantive Consolidation Order").)  The Substantive Consolidation Order, which merged the Chapter 7 personal estate of Madoff into the BLMIS

SIPA proceeding nunc pro tunc, preserved the SIPA Trustee's authority to avoid and recover fraudulent transfers of customer property.  (Substantive Consolidation Order ¶ 4.)

### C.  *The Transfers to Zieses*

The Zieses Investment Partnership is a limited partnership that was formed under the laws of the State of Connecticut.  (Pl.'s 56.1 ¶ 107.)  Zieses became a client of Madoff's IA Business on March 7, 1994 when a check in the amount of $227,000 was deposited into BLMIS Account No. 1Z001 ("Zieses Account).  (Greenblatt Report[9] ¶ 11).  Between March 7, 1994 and December 11, 2008, Defendants made 25 additional deposits—including a deposit into the 703 Account on July 17, 2008 for $500,000, (Defs.' 56.1 ¶ 74; Chaitman Decl.[10] Ex. Q)—in the aggregate amount of $1,679,503, providing the Zieses Account with $1,906,503 of principal.  (Greenblatt Report ¶¶ 12–13.)  Defendants made 33 withdrawals in this timeframe, totaling $3,114,190, consisting of principal and fictitious profits.  (*Id*. ¶ 14.)  Over the life of the Zieses Account, Defendants withdrew $1,207,687 of funds in excess of principal.  (*Id*. ¶ 15.)  From December 11, 2006 to December 11, 2008 (the "Two-Year Period")[11], $1,015,000 of fictitious profits was withdrawn.  (*Id*.)

### D.  *The Instant Action*

On December 1, 2010, the Trustee filed a complaint against Zieses and seven of its general partners to recover transfers made from BLMIS LLC in the Two-Year Period.  On April

---

[9] "Greenblatt Report" refers to the November 15, 2022 expert report of Matthew G. Greenblatt, filed as an attachment to the declaration of Matthew G. Greenblatt ("Greenblatt Decl."), filed in support of the Trustee's motion for summary judgment.  (Doc. 15, Ex. A.)

[10] "Chaitman Decl." refers to the declaration of Helen Davis Chaitman, filed in support of Defendants' memorandum of law in opposition to the Trustee's motion for summary judgment and in support of their cross motion for summary judgment.  (Doc. 20.)

[11] Under SIPA, disbursements to "good faith" customers from BLMIS LLC may be recovered by the debtor—here, BLMIS LLC—from the two-year period prior to the commencement of the SIPA liquidation.  11 U.S.C. § 548(a)(1)(A).

7, 2020, after the close of discovery and pursuant to 28 U.S.C. § 157(d) and Rule 5011 of the

Federal Rules of Bankruptcy Procedure, Defendants filed a motion to withdraw the bankruptcy

reference, asserting that "all pre-trial proceedings have been completed" and that "they have the

constitutional right to a trial by jury," which the Bankruptcy Court cannot conduct.  (Doc. 1.)  On

consent of the Trustee, I granted the motion to withdraw.  (Doc. 4.)

On June 30, 2020, the Trustee filed his motion for summary judgment, as well as an

accompanying memorandum of law, Rule 56.1 Statement, and declarations.  (Docs. 9–15.)  On

August 4, 2020, Defendants cross moved for summary judgment, and filed an accompanying

memorandum of law, counter Rule 56.1 Statement, and declarations in support of their motion.

(Docs. 16–20.)  On August 25, 2020, the Trustee filed his reply memorandum of law, response to

Defendants' Rule 56.1 Statement, and a supporting declaration.  (Docs. 24–27.)  On September

1, 2020, Defendants filed their reply memorandum of law.  (Doc. 27.)  Since briefing has been

completed, the parties have filed multiple letters providing notice of supplemental authority.

(Docs. 27–42.)

## II.   **Legal Standard**

Summary judgment is appropriate when "the parties' submissions show that there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see also* Fed. R. Civ. P.

56(a).  "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists; if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id*. at 256 (internal quotation marks omitted), and to present such evidence that would allow a reasonable jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "If a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3).

"[T]he evidence considered on summary judgment must generally be admissible evidence."  *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017); *see also* Fed. R. Civ. P. 56(c)(4) ("[D]eclaration used to support or oppose a motion [for summary judgment] must . . . set out facts that would be admissible in evidence.").  A district court on summary judgment "has wide discretion in determining which evidence is admissible."  *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 205 (2d Cir. 2005) (internal quotation marks omitted).  Finally, the court must "view the evidence in the light most favorable to the

non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks and citation omitted); *see also Matsushita*, 475 U.S. at 587.  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

### III.   Discussion

#### A.  *Standing*

Defendants argue, as a threshold matter, that the Trustee lacks Article III standing because the IA Business was never part of BLMIS LLC, and the LLC therefore did not own the bank accounts from which the transfers in question were made.  (Defs.' Mem.[12] 6–9.)  I will address this argument first, as standing is an issue that "must be resolved before turning to the merits."  *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015).

#### 1.  Applicable Law

##### a.   Standing Generally

"The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance."  *Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n*, 747 F.3d 44, 48 (2d Cir. 2014) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 128–29 (2004)).  "In its constitutional dimension, standing imports justiciability:  whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III."  *Warth*

---

[12] "Defs.' Mem." refers to Defendants' memorandum of law in opposition to the Trustee's motion for summary judgment and in support of their cross motion for summary judgment.  (Doc. 17.)

*v. Seldin*, 422 U.S. 490, 498 (1975).  "To have such Article III standing, 'the plaintiff must have alleged such a personal stake in the outcome of the controversy as to warrant its invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on its behalf."  *Cortlandt St. Recovery Corp.*, 790 F.3d at 417 (alterations omitted) (quoting *Warth*, 422 U.S. at 498–99).  A plaintiff claiming such a stake must establish, "(1) *injury-in-fact,* which is a concrete and particularized harm to a legally protected interest; (2) *causation* in the form of a fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) *redressability*, or a non-speculative likelihood that the injury can be remedied by the requested relief."  *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106–07 (2d Cir. 2008) (internal quotations marks omitted).

### b.   A SIPA Trustee's Standing to Recover Customer Property

A bankruptcy trustee stands in the shoes of the bankrupt corporation and has standing to assert "any claims that the corporation could have instituted prior to filing its petition for bankruptcy."  *See In re Mediators, Inc.*, 105 F.3d 822, 825–26 (2d Cir. 1997) (citing 11 U.S.C. §§ 541, 542).  The same is true with a SIPA trustee.  *See In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54, 71 (2d Cir. 2013) ("As a general rule, SIPA vests trustees with 'the same powers and title with respect to the debtor and the property of the debtor as a trustee in a case under Title 11." (alterations omitted) (quoting 15 U.S.C. § 78fff–1(a)).)  Because customer property held by a broker is not the broker's property, it would not ordinarily be recoverable by a trustee in a bankruptcy.  A SIPA trustee, however, is allowed to recover customer property "through a statutorily created legal fiction that confers standing on a SIPA trustee by treating customer property as though it were property of the debtor in an ordinary liquidation."  *Picard v. Fairfield*

*Greenwich Ltd.*, 762 F.3d 199, 213 (2d Cir. 2014) (internal quotation marks omitted).

Specifically, SIPA Section 78fff-2(c)(3) provides:

> [T]he Trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11.  Such recovered property shall be treated as customer property.  For purposes of such recovery, the property so transferred shall be deemed to have been the property of the debtor and, if such transfer was made to a customer or for his benefit, such customer shall be deemed to have been a creditor, the laws of any State to the contrary notwithstanding.

15 U.S.C § 78fff-2(c)(3).

## 2.  Application

Although Defendants concede that the Trustee has standing to recover transfers made by BLMIS LLC, they contend that because the IA Business was owned by Madoff personally and was at no point transferred to BLMIS LLC after the LLC was formed in 2001, that the Trustee lacks standing because he cannot establish any injury.  (Defs.' Mem. 7.)  I disagree.

As the Trustee contends, consistent with the other judges in this district who have rejected this argument, "whether the transfers were made by BLMIS LLC or Madoff goes to the merits of the Trustee's claim, not to the Trustee's standing or this Court's jurisdiction."  (Pl.'s Reply. Mem.[13] 3.); *see In re Bernard L. Madoff Inv. Sec. LLC*, No. 21-CV-02334, 2022 WL 493734, at *11 (S.D.N.Y. Feb. 17, 2022) (*Seymour Epstein*), *appeal withdrawn*, No. 22-551, 2022 WL 2125334 (2d Cir. May 20, 2022); *Picard v. RAR Entrepreneurial Fund, Ltd.*, 20-CV-1029, 2021 WL 827195, at *4 (S.D.N.Y. Mar. 3, 2021) ("*RAR*") (citing *Securities Inv. Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)*, 610 B.R. 197, 216 (Bankr. S.D.N.Y. 2019) (*Nelson*)).  As the Bankruptcy Court explained in an action brought by the

---

[13] "Pl.'s Reply Mem." refers to the Trustee's reply memorandum of law in further support of his motion for summary judgment.  (Doc. 24.)

Trustee in which defendants—represented by the same counsel as Defendants here—asserted the same argument:

> [The Trustee] brings the avoidance actions as a representative of an insolvent customer property estate to avoid and recover transfers for the benefit of the customer property estate which was injured by the fraudulent transfers of customer property, and the Trustee's action will redress that injury by replenishing the funds in the customer property estate available to satisfy the customers' net equity claims in the SIPA proceeding.

*Nelson*, 610 B.R. at 215–216.

In *Nelson*, the Bankruptcy Court opined that the Trustee "certainly has standing to argue that BLMIS made the Two-Year Transfers.  If he cannot prove this, he will lose on the merits." *Id*. at 216 (footnote omitted).  The same logic applies here.  Apparently recognizing this logic, Defendants repurpose their standing argument as an independent basis for denying the Trustee's motion for summary judgment, attacking the Trustee's prima facie case by arguing that the Trustee cannot prove a "transfer of an interest of the debtor in property" because the LLC never owned the IA Business.  (Defs.' Mem. 19.)  Therefore, Defendants' standing argument fails.

Even if Defendants were correct to cast their motion as turning on standing, however, and as discussed in greater detail below, *see* Section III.C.1, there is no dispute that the IA Business and the JPMorgan Accounts were property of the BLMIS LLC.  In addition, Defendant's argument that the Bankruptcy Court's decision in *Avellino* bars the Trustee from recovering has already been squarely rejected by the Second Circuit.  *See JABA II*, 49 F.4th at 179.[14]

---

[14] In *Avellino*, the bankruptcy court held that only the Chapter 7 trustee for the Madoff estate could recover transfers by the sole proprietorship, and because he is not a SIPA trustee, he could not recover property withdrawn prior to January 1, 2001.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 557 B.R. 89, 110 (Bankr. S.D.N.Y. 2016) ("*Avellino*"), *reconsideration denied*, 2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016).  Here, Defendants argue that this holding compels a finding that the Trustee lacks Article III standing, barring any recovery.  In *JABA II*, the Second Circuit squarely rejected this argument, holding that the Trustee there, as here, "only seeks to recover two-year transfers, which the bankruptcy court in *Avellino* held the Trustee may avoid and recover against similarly situated defendants."  *JABA II*, 49 F.4th at 179.

Accordingly, I find that the Trustee has standing to bring this avoidance and recovery action, and Defendants motion for summary judgment based on the Trustee's lack of standing is DENIED.

### B. *Admissibility of Evidence*

Defendants next assert that the Trustee's motion must be denied because it relies on inadmissible evidence, specifically the expert report and trial testimony of Bruce G. Dubinsky[15] and the criminal plea allocutions and trial testimony of Madoff and other BLMIS LLC employees.  (*Id.*)  Because it is "axiomatic that, when reviewing a summary judgment determination, [a court] may only consider admissible evidence," *Bellamy v. City of New York*, 914 F.3d 727, 750 (2d Cir. 2019), I will first address the admissibility of this evidence before turning to the merits of the parties' cross motions, *see also* Fed. R. Civ. P. 56(c)(2).

#### 1. Admissibility of the Expert Report and Testimony of Bruce Dubinsky

In considering all relevant admissible evidence when ruling on a summary judgment motion, "there can be no question that expert opinions, as a general matter, are admissible so long as they meet the criteria set forth in Federal Rule of Evidence 702."  *See Olin Corp. v. Lamorak Ins.*, 332 F. Supp. 3d 818, 838 (S.D.N.Y. 2018) (internal quotation marks omitted); *In re Barclays Bank PLC Sec. Litig.*, 756 F. App'x 41, 47 n.5 (2d Cir. 2018).  Defendants' principal argument is that Dubinsky's report and trial testimony is inadmissible because it is based substantially on BLMIS LCC's books and records, which are themselves "permeated with fraud" and unreliable.  (Defs.' Mem. 14.)  Although "[e]xperts are generally permitted to rely on otherwise inadmissible evidence in formulating an expert opinion," *Howard v. Walker*, 406 F.3d

---

[15] Although Defendants' memorandum includes the header, "The Expert Reports Are Inadmissible," the substance of Defendants' argument refers only to the admissibility of the expert report and testimony of Dubinsky. Defendants do not specifically argue that the expert reports of Lisa M. Collura or Matthew G. Greenblatt are inadmissible.  Therefore, I find the Collura and Greenblatt expert reports to be admissible.

114, 127 (2d Cir. 2005), Defendants nonetheless seek to cast the BLMIS LLC books and records as lacking the indicia of trustworthiness required to qualify as business records, *see* Fed. R. Evid. 803(6), or to be admissible under the residual exception, *see* Fed. R. Evid. 807(a).

Defendants' argument is without merit, and has been repeatedly rejected by several courts. *See RAR*, 2021 WL 827195, at *4 (collecting cases). I find no reason, on the record before me, to depart from the reasoning of the many courts that have deemed the BLMIS LLC books and records admissible business records under Rule 803(6) of the Federal Rules of Evidence. As Judge John G. Koeltl explained, "[i]f the defendants' argument were true, a case involving fraud would never benefit from expert testimony about the alleged fraud because the records at issue were fraudulent." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 528 F. Supp. 3d 219, 232 (S.D.N.Y. 2021) ("*JABA I*"), *aff'd sub nom. JABA II*, 49 F.4th 170; *see also Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 20-CV-3140 (JGK), 2021 WL 1141638, at *7 (S.D.N.Y. Mar. 24, 2021) ("*Nissenbaum*"). Indeed, an expert's "discerning review" of records can often help the trier of fact "even if aspects of the records—such as securities that were listed but not purchased—were false." *JABA I*, 528 F. Supp. 3d at 232.

Here, Dubinsky relied on the BLMIS LLC books and records to determine, in part, what the records failed to record, where the records were fabricated, and to uncover what was hidden behind the recorded trades and prices. (*See e.g.* Dubinsky Report ¶ 20 ("reconcil[ing]" the books and records and concluding that "no securities transactions were executed by the IA Business").) Moreover, as noted by Judge Koeltl, not only are such records commonly admitted into evidence as business records, *see JABA I,* 528 F. Supp. 3d at 232 (collecting cases where fraudulent activity did not preclude admission of books and records), but the BLMIS LLC records themselves have been deemed admissible several times in this liquidation, *id.* (citing *Nelson*, 610

B.R. 197, 223–24; *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (In re Bernard L. Madoff), 592 B.R. 513, 527–29 (Bankr. S.D.N.Y. 2018), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec., LLC*, 605 B.R. 570 (S.D.N.Y. 2019), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 830 F. App'x 669 (2d Cir. 2020). Therefore, Defendants argument fails, and I will consider Dubinsky's expert report and testimony in deciding the parties' cross motions for summary judgment.

### 2. Admissibility of Plea Allocutions and Trial Testimony

Defendants also argue that the various plea allocutions and trial testimony that the Trustee relies on are inadmissible. This argument fails. With regard to the plea allocutions, and as several courts rejecting this same argument have held, criminal plea allocutions are admissible pursuant to Rule 803(22) of the Federal Rules of Evidence to prove "any fact essential to the judgment." *See RAR*, 2021 WL 827195, at *7; *see also JABA I,* 528 F. Supp. 3d at 233; *Nelson*, 610 B.R. at 209; *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 603 B.R. 682, 68–90 & n.8 (Bankr. S.D.N.Y. 2019) ("*Legacy Capital*") (collecting cases) ("The Court may rely on a plea allocution as evidence to support a fact."). In arguing otherwise, Defendants suggest that Madoff's statements regarding his fraudulent scheme are not "essential to the judgment," and are therefore inadmissible under Rule 803(22), because Madoff was never charged with operating a Ponzi scheme and never testified as to his understanding of the meaning of the phrase Ponzi scheme. (Defs.' Mem. 17.) This argument is wrong. Madoff testified that he "represented to clients and prospective clients . . . that [he] would invest their money in shares of common stock, options, and other securities of large well-known corporations, and upon request, would return to them their profits and principal," but in fact "never invested these funds in the securities, as [he] had promised." (Madoff Allocution 24:9-22.) Whether he used the term "Ponzi scheme" in his

allocution is irrelevant as to its admissibility.  Madoff's allocution demonstrated that he operated a massive fraudulent scheme, a fact which was essential to his guilty plea and the judgment in his criminal securities fraud case.  *See* Fed. R. Cr. P. 11(b)(3) ("Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea.").  Similarly, the trial testimony of Frank DiPascali ("DiPascali"), a BLMIS LLC employee who testified during the December 2013 criminal trial of several former Madoff employees and died on May 7, 2015, is admissible under the residual hearsay exception.  *See* Fed. R. Evid. 807; *see also JABA I*, 528 F. Supp. 3d at 233 (finding that "on balance, and in the interests of justice, the testimony is sufficiently reliable to be admitted under Rule 807").  Thus, I will consider the plea allocutions of Madoff and DiPascali, as well as the trial testimony of DiPascali, in deciding the parties' cross motions.

## C.  *The Trustee's Fraudulent Transfer Claim Under Section 548(a)(1)(A)*

Turning to the merits of the parties' cross motions, the Trustee seeks, pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, to avoid and recover transfers of fictitious profits that were made to Defendants.  (Pl.'s Mem. 5.)  To prove this claim, the Trustee must establish the following elements:  (1) a transfer of an interest of the debtor in property; (2) made within two years of the date the debtor filed for bankruptcy; (3) with "actual intent to hinder, delay, or defraud" a creditor.  *Adelphia Recovery Tr. v. Bank of Am., N.A.*, Nos. 05-CV-9050 (LMM) & 03-MD-1529, 2011 WL 1419617, at *2 (S.D.N.Y. Apr. 7, 2011), *aff'd sub nom. Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110 (2d Cir. 2014); *see also Nelson*, 610 B.R. at 232 (stating the elements of a claim pursuant to 11 U.S.C.§ 548(a)(1)(A)).  I will address each element in turn.

### 1. Transfer of an Interest of the Debtor Property

First, the Trustee must prove that there was a transfer of an interest of the debtor—BLMIS LLC—in property.  In arguing that the Trustee failed to demonstrate that BLMIS LLC had an interest in the funds that were transferred to the Partnership, Defendants echo their attack on the Trustee's standing, asserting that BLMIS LLC "never owned the funds in the 703 and 509 Accounts" that were transferred to Defendants.  (Defs.' Mem. 19.)

Notably, the Second Circuit addressed this precise issue in affirming the district court's decision to grant summary judgment in favor of the Trustee on a nearly identical record, and involving the same arguments advanced here.  *See JABA II*, 49 F.4th at 184.  In *JABA II*, the defendants challenged the district court's holding that there existed no dispute of material fact that Madoff transferred the IA Business and the JPMorgan Accounts from the sole proprietorship to BLMIS LLC.  *Id*. at 181.  Citing the same evidence as they do here, (*see* Defs.' Mem. 8), the defendants argued that after Madoff converted his firm to BLMIS LLC in 2001, the sole proprietorship continued to run the IA Business, while the proprietary trading business and market-making business were operated by the LLC.  *Id*. at 183.  The Second Circuit affirmed the district court's finding that the evidence cited by the defendants was insufficient to create a dispute of material fact as to whether BLMIS LLC owned the JPMorgan Accounts, noting the "overwhelming evidence that BLMIS took over all aspects of the sole proprietorship."  *Id*.[16]

The evidence presented in *JABA I*, which the Second Circuit deemed "sparse" and "insufficient to create a dispute of material fact" is nearly identical to the evidence submitted by

---

[16] In a different case stemming from the SIPA liquidation, Judge Jesse M. Furman determined on cross motions for summary judgment that there existed issues of material fact regarding whether the transfers were made by BLMIS LLC which could not be resolved at the summary judgment stage.  *See RAR*, 2021 WL 827195 at *12.  In reviewing the same evidence that is before me, the Second Circuit considered whether the lower court should have followed Judge Furman's decision, ultimately "affirm[ing] the district court's finding that the record did not raise a question of material fact as to whether BLMIS owned the JPMorgan accounts."  *JABA II*, 49 F.4th at 184.

Defendants here.  *Id.* at 183.  Specifically, Defendants present numerous statements demonstrating that the JPMorgan Accounts were held in the name of either "Bernard L. Madoff" or "Bernard L. Madoff Investment Securities," not BLMIS LLC.  (Defs.' 56.1 ¶¶ 19–20, 27.) Defendants also present checks deposited into the 703 Account which read, "[f]or deposit only Bernard L. Madoff."  (*Id.* ¶ 23.)  However, as the Trustee points out, the bank statements were addressed to either Tony Tiletnick or Daniel Bonventre, both of whom were employees of BLMIS LLC.  (Pl.'s 56.1 ¶ 88.)  It is not surprising that the JPMorgan Accounts bear the name of Madoff (or his sole proprietorship), as even the evidence submitted by Defendants demonstrates that Madoff was the sole member of BLMIS LLC.  (*See* Chaitman Decl. Exs. E, F, G (letters written by Madoff which noted that the "sole member of [BLMIS LLC] is Bernard L. Madoff").) As the Bankruptcy Court has observed, "Madoff was not particularly attentive to the names he used" in operating his business, *Nelson*, 610 B.R. at 218, and these statements are not sufficient to show that the JPMorgan Accounts were never owned and controlled by BLMIS LLC.

Defendants do not present any expert testimony, or other evidence, to support their contention that the JPMorgan Accounts were used by Madoff personally instead of as part of BLMIS LLC.  Instead, Defendants rely on Madoff's failure to check "investment advisory services" under the list of "business engaged" when he changed the corporate form of Madoff Securities from sole proprietorship to LLC.  (Am. Form BD 8–9.)  Defendants here—as in *JABA I*—do not point to any expert opinion or other evidence contravening the Trustee's contention that all of the assets of the sole proprietorship were indeed transferred to the LLC in 2001.  *See JABA II*, 49 F.4th at 185.  Nor can they; the Form BD itself belies any suggestion otherwise.  Madoff specifically noted that the LLC "will transfer to successor all of

predecessor's assets and liabilities related to predecessor's business," and that the transfer "will not result in any change in ownership or control."  (Am. Form BD 11.)

Defendants also rely on certain letters Madoff sent to the Bank of New York—which held accounts for its proprietary trading and market making businesses—as well as those sent to government agencies, such as the National Securities Clearing Corporation.  (Defs.' Mem. 8–9.) Far from indicating that only the proprietary trading and market making businesses had been transferred to BLMIS LLC, as Defendants suggest, (*see* Defs.' Reply 2), the letters simply indicate that Madoff Securities had "changed its legal status from a sole proprietorship to a limited liability company."  (*See* Chaitman Decl. Exs. E, F, G.)

Accordingly, having reviewed the admissible evidence before me, I find that there is no dispute of material fact that the IA Business and the JPMorgan Accounts were property of BLMIS LLC.  Pursuant to SIPA, because the funds were transferred from BLMIS LLC to Defendants, BLMIS LLC has an interest in the transferred property at issue in this case.

### 2.  Two Year Period

Next, the Trustee must prove that the transfers were made within two years of the SIPA petition date.  Defendants do not contest that the Trustee seeks to recover only the $1,015,000 that was transferred during the Two-Year Period.  Accordingly, the Trustee has shown that the transfers he seeks to recover were within two years of the petition date.

### 3.  Intent to Hinder, Delay, or Defraud

Next, the Trustee must prove that the transfers were made with the actual intent to hinder, delay, or defraud a creditor.  It is indisputable that "Madoff operated the largest, longest running Ponzi scheme in history."  *Legacy Cap.*, 603 B.R. at 693.  Despite the "breadth and notoriety" of Madoff's scheme, *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011),

Defendants nonetheless contend that the "Ponzi scheme presumption"—which would deem, as a matter of law, all transfers to have been made with fraudulent intent—is inapplicable.  *See id*. at 330 ("[T]he fraudulent intent on the part of the debtor/transferor . . . is established as a matter of law by virtue of the 'Ponzi scheme presumption'").

In determining whether the Ponzi scheme presumption applies, courts in this Circuit often apply a four-factor test:  whether (1) deposits were made by investors; (2) the debtor conducted little or no legitimate business; (3) the debtor produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors.  *See Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, No. 08-15051 (SMB), 2014 WL 47774, at *9 (Bankr. S.D.N.Y. Jan. 3, 2014).  With regard to the first factor, Defendants argue that they did not make deposits because they were creditors, not equity investors.  This is a distinction without a difference.  There is no question that Defendants invested money with BLMIS LLC.  *See JABA I,* 528 F. Supp. 3d at 238 ("Regardless of whether the defendants were creditors or equity investors, it is plain that they invested money with BLMIS with an expectation of a high return, and that return was obtained only by the use of fraud.")

As to the second and third factors, Defendants again rely on their argument that the IA Business was not part of BLMIS LLC, arguing that the IA Business conducted legitimate business through the purchase of U.S. Treasury bills ("T-Bills") and was profitable.  This argument fails for a number of reasons.  First, as discussed above, there is no dispute of material fact that the IA Business was part of BLMIS LLC.  Second, with respect to the purchase of T-Bills, the undisputed expert report and testimony of Dubinsky makes clear that although BLMIS LLC purchased T-Bills using money from the 703 Account, these purchases did not reflect legitimate trading, and "were not purchased for the IA Business Customers" but rather to earn

additional interest on the customer cash that BLMIS LLC was holding.  (Dubinsky Report ¶ 228).  Defendants do not present any evidence to the contrary, did not serve rebuttal reports, and took no depositions of Plaintiff's expert witnesses.  Instead, Defendants attack Dubinsky's credibility and accuse him of committing perjury during his testimony in the *Nelson* trial. (Defs.' Mem. 17–18.).  I agree with the Trustee that this argument is based solely on rhetoric, and is belied by the record, including the consistencies between Dubinsky's report and his testimony during the *Nelson* trial.  (See Pl's. Mem 11–12; Chaitman Decl. Ex. A ("Nelson Tr.") at 92:6–21, 128:5–19, 129:9–132:14, 177:16–178:12.)  Thus, I agree with the other courts that have addressed this issue and find that any T-Bill purchases were part of the ongoing fraudulent scheme, and that the T-Bill positions that appeared on customer statements were fictious.  *See, e.g., JABA I*, 528 F. Supp. 3d at 238–39 ("[T]here is no dispute of material fact that the IA Business did not conduct legitimate business by purchasing T-Bills on behalf of its customers."); *Nissenbaum*, 2021 WL 1141638, at *12–13 (same); *RAR*, 2021 WL 827195, at *8–9 (same); *Nelson*, 610 B.R. at 214, 234 n.37 (same); *Legacy*, 603 B.R. at 691 (same); *Seymour Epstein*, 2022 WL 493734, at *14 (same).

Third, the plea allocutions of Madoff and other BLMIS LLC employees both corroborate Dubinsky's testimony and provide an independent basis to reject Defendants' argument regarding the T-Bill trades.  During his allocution, Madoff stated that he "represented to clients . . . that [he] would invest their money" while in fact he "never invested these funds" but only "used the money . . . that belonged to them or other clients to pay the requested [withdrawal of principal and profits]."  (Madoff Allocution 24:9–22.)  In addition, DiPascali testified during the criminal trial of Daniel Bonventre, among others, that the T-Bill trades were not made for the IA Business customers, but instead for BLMIS's cash management purposes.  (DiPascali

Testimony[17] at 4931:12–23, 4921:7–12, 4930:6–4931:5, 4934:3–25, 5345:1–5346:3.)  DiPascali further explained how the T-Bill trades which appeared on the IA Business customer statements were fabricated, (*id.* at 4931:24–4934:13), and described how Madoff "attracted a lot of . . . clients by telling them that the firm would apply a hedged investment strategy to their money" while in fact "[n]o purchase [or] sales of securities were actually taking place in [the clients'] accounts," (DiPascali Allocution[18] at 45:21–46:15.)  Consistent with the many "courts in this District [that] have repeatedly considered such evidence to establish the Ponzi scheme presumption," *see RAR,* 2021 WL 827195, at *7 (collecting cases), I find that this evidence establishes that BLMIS LLC did not conduct legitimate business and did not produce legitimate profits or earnings.

With regard to the fourth factor—whether the source of payments to investors was from cash infused by new investors—Defendants offer nothing more than a conclusory assertion that the Trustee has failed to refute Madoff's testimony that he "did not require the deposits of other customers to pay out existing customers."  (Defs.' Mem. 24.)  The Trustee presented more than sufficient evidence to establish that the source of payments to existing customers was from cash infused by new investors.  Both Dubinsky and Collura opined that ninety-seven percent of all cash additions into the 703 Account came directly from IA Business customers.  (Pl.'s 56.1 ¶ 73; Dubinsky Report ¶ 340 n.285, Figure 52; Collura Report[19] ¶ 24, Figure 1.)  Defendants have offered no evidence to rebut the experts' opinions and substantial evidence that the IA Business

---

[17] "DiPascali Testimony" refers to the multi-day trial testimony of Frank DiPascali, filed as an exhibit to the Cremona Declaration.  (Doc. 13, Ex. 3.)

[18] "DiPascali Allocution" refers to the allocution of Frank DiPascali on August 11, 2009 before Judge Richard J. Sullivan, filed as an exhibit to the Cremona Declaration.  (Doc. 13, Ex 6.)

[19] "Collura Report" refers to the January 16, 2019 expert report of Lisa M. Collura, CPA, CFE, CFF, filed as an exhibit to the declaration of Lisa M. Collura (Collura Decl.) filed in support of the Trustee's motion for summary judgment.  (Doc. 14.)

had no other source of funds, and that customer redemptions were paid with funds from the 703 Account.

As a final attempt to defeat the Ponzi scheme presumption, Defendants also argue that the payments were not made "in furtherance" of a Ponzi scheme. Again, Defendants' argument is conclusory and without merit. As previous courts that have considered this argument have held, "the Two-Year Transfers at issue in the BLMIS liquidation . . . served to further the Ponzi scheme, and are therefore presumed fraudulent." *JABA I,* 528 F. Supp. 3d at 232 (quoting *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 105 (Bankr. S.D.N.Y. 2011)). Stated another way, Madoff's perpetuation of his fraudulent scheme for years by using client funds to pay customers who requested redemptions is the sine qua non of a Ponzi scheme.

Having applied the four-factor test to the record before me, including the Dubinsky Report and testimony, the Collura Report, Madoff's and DiPascali's allocutions, and DiPascali's trial testimony, I find that the Ponzi scheme presumption applies. The Trustee can, therefore, prove that all of the transfers made from BLMIS LLC to Defendants were made with actual intent to hinder, delay, or defraud a creditor as a matter of law.

Accordingly, having established all of the required elements, the Trustee has made a sufficient showing of his prima facie case pursuant to Section 548(a)(1)(A).

### D.  *Affirmative Defenses*

Defendants assert two affirmative defenses that they argue require granting their summary judgment motion and dismissing the Trustee's claims. First, they argue that the defendants offered value for each transfer. Second, they argue that Section 548(a)(1) is a statute of repose that bars recovery, and that they are entitled to credits for deposits made within the

Two-Year Period.  In light of the Second Circuit's decision in *Gettinger*, however, both of these defenses fail as a matter of law.  976 F.3d at 188.

### 1.  "For Value" Under Section 548(c)

Section 548(c) provides an absolute defense and limits the Trustee's authority to void a transfer if the transferee "takes for value and in good faith has a lien on or may retain any interest transferred . . . to the extent that such transferee . . . gave value to the debtor in exchange for such transfer."[20]  11 U.S.C. § 548(c).

In arguing that each transfer was exchanged "for value," Defendants rely on the Second Circuit's decision in *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir. 2014) ("*Ida Fishman*").  According to Defendants, because the Second Circuit held in *Ida Fishman* that Madoff owed the Partnership debts and obligations at the time of each withdrawal, "every customer held a securities contract to which the payments the Trustee seeks to claw back related."  (Defs.' Mem 27.)  Thus, Defendants argue that the payments were "settlement payments responsive to customers' instructions to the broker to liquidate a portion of the securities in their accounts."  (*Id.*)  Defendants argue, as they did in *Gettinger*, that "[i]t follows, therefore, that there was an exchange of consideration at the time of each transfer, notwithstanding the broker's fraud."  (*Id.*)  In *Gettinger*, the Second Circuit rejected this argument as "misread[ing] [its] use of the phrase 'enforceable securities entitlement' and "mischaracteriz[ing] the context in which [the Second Circuit] used it" in *Ida Fishman*.  976 F.3d at 196–97 (internal quotation marks omitted).  As the Second Circuit explained, "regardless of whether [Defendants] had securities entitlements as a result of the account statements, they did not have property rights to the values in excess of principal reflected there.  Accordingly, when

---

[20] Here, there is no dispute that Defendants acted in good faith.

BLMIS LLC transferred those full values to the [Defendants], the transfers were not in satisfaction of property rights and therefore were not 'for value.'" *Id.* at 198.

Defendants also argue that the transfers were made for value because they satisfied antecedent debts incurred as a result of their ability to bring state law tort claims for fraud and breach of fiduciary duty against BLMIS. (Defs.' Mem. 28.) The Second Circuit also rejected this alternative argument, noting that to hold otherwise would "conflict with SIPA's legally binding priority system." *Id.* at 198; *see also JABA I*, 528 F. Supp. 3d at 242 ("[Defendants'] argument fails because 'recognizing [Defendants'] for value defense would place the [Defendants], who have no net equity and thus are not entitled to share in the customer property fund, ahead of customers who have net equity claims. SIPA does not permit it.'" (alterations omitted) (quoting *Gettinger*, 976 F.3d at 199.)); *see also RAR*, 2021 WL 827195, at *11 (same). Thus, the transfers made from BLMIS LLC to Defendants were not "for value" under Section 548(c).

### 2.  Statute of Repose and Limitations of Recovery

Defendants also argue that because Section 548(a)(1) is a statute of repose, it applies to all claims under Section 548(a) and "bars a trustee from avoiding both the obligation incurred more than two years before the filing and the payments that satisfied the antecedent obligation under § 548(c)." (Defs.' Mem. 31.) Because the obligations at the time of the November 30, 2006 account statement reflect securities held valued at $1,330,490,40, the Defendants contend that the Trustee can only recover withdrawals taken in the last two years of Madoff's activity to the extent they exceed this balance. The Second Circuit, however, rejected this argument in *Gettinger*, finding that "when the [Defendants] and BLMIS entered into a securities contract, no right to the transfers at issue arose" and "[Defendants] had contracted for access to BLMIS's

purported trading strategy and any profits that resulted from that strategy."  976 F.3d at 201.

Because BLMIS LLC never traded in securities and never generated any legitimate profits,

however, Defendants have "no rights to the transfers let alone rights that arose prior to the two-

year limitation period."  *Id*.

Similarly, Defendants argue that that they should be credited for the $500,000 deposit

that was made into the Partnership Account in the Two-Year Period.  (Defs.' Mem. 32.)  This

argument was squarely rejected by the Second Circuit's holding in *Gettinger* that although a

Trustee may only recover transfers that occurred within the Two-Year Period under Section

548(a)(1), "[t]here is no such limitation on a trustee's 'legal authority' to compute exposure

under the fraudulent transfer provisions."  976 F.3d at 201.  Here, to calculate the amount of

recoverable profits, the Trustee used the "Net Investment Method," which Defendants' seek to

discredit, but which has previously been upheld by the Bankruptcy Court and affirmed by the

Second Circuit.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 238 (2d Cir. 2011)

("[T]he Net Investment Method is consistent with the purpose and design of SIPA.").  The

Trustee's expert, Matthew Greenblatt, applied this method to calculate the Defendant's ending

principal balance by taking into account all of the customer deposits as additions to principal and

all of the customer withdrawals or inter-account transfers as reductions to principal.  (*See*

Greenblatt Report ¶¶ 4–5.)  If the amount Defendants received exceeded the amount invested,

the difference is considered "fictitious profits."  (*Id*.)   If the customer received any withdrawals

from BLMIS LLC in the Two-Year Period, the amount of those withdrawals is recoverable.

Here, between March 7, 1994 and December 11, 2008, $3,114,190 was withdrawn from

BLMIS[21], which consisted of $1,906,503 of principal and an additional $1,207,687 of funds

---

[21] Defendants contend that the Trustee "does not have any evidence to support an alleged withdrawal of $36,000"
which "renders the principal balance calculation the Trustee bases his claims upon unsubstantiated as a whole."

withdrawn in excess of principal, representing fictitious profits over the life of the Zieses

Account.  (*Id*. ¶ 15.)  Within the Two-Year Period prior to December 11, 2008, $1,015,000 of

fictitious profits was withdrawn from the Zieses Account, (*id*. ¶ 15), all of which the Trustee

seeks to recover.

As explained in *Gettinger*, the Net Investment method abides by Section 548(a)(1)'s

limitation on a Trustee's authority while "appropriately calculating harm or benefit to the estate,

which is unrelated to a line drawn at a certain point in time for purposes of granting finality to

ancient transactions."  976 F.3d at 202 (internal quotation marks omitted).  Here, because the

Trustee seeks only to recover "fictitious profits," "respect[ing] a line between those transfers that

were received for value and those that were not," Defendants are not entitled to a $500,000

credit.  *Id* at 201.

Accordingly, neither of Defendants' affirmative defenses compel denying the Trustee's

motion for summary judgment or granting Defendants' cross motion, and both defenses are

hereby dismissed.

### E.  *Prejudgment Interest*

Lastly, the Trustee has sought prejudgment interest at a rate of 4% from the date the

Trustee filed his complaint against Defendants on November 12, 2010.  As an initial matter,

Defendants do not seriously dispute the Trustee's entitlement to prejudgment interest, nor do the

parties address what the proper rate should be.  In this Circuit, "the award should be a function of

(i) the need to fully compensate the wronged party for actual damages suffered, (ii)

---

(Defs.' Mem. 33.)  This argument ignores the evidence to the contrary, including the analysis of the Trustee's expert Lisa M. Collura that this amount was withdrawn, (*see* Collura Report ¶¶ 33–40), as well as April 26, 1997 correspondence from Marshall Zieses sent to DiPascali requesting "$36,000 from . . . [the] Zieses Investment Account,"  (Chaitman Decl., Ex. AA (April 26, 1997 correspondence from Marshall Zieses to Frank DiPascali dated stating "kindly send me $36,000 from . . . [the] Zieses Investment Account.").)

considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co., Inc. v. Local Union No. 3, Intern. Broth. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 833–34 (2d Cir. 1992).

Prejudgment interest at differing rates has been awarded by different courts against several defendants in this SIPA liquidation.  *JABA I*, 528 F. Supp. 3d at 246 (collecting cases).  In *JABA II*, the Second Circuit affirmed the district court's decision awarding the Trustee prejudgment interest at a rate of 4%, finding that the court did not abuse its discretion and that the 4% rate "appropriately balanced the equities between the parties."  49 F.4th at 186.  I find no reason to depart from Judge Koeltl's sound reasoning in *JABA I*.  There, the court "surveyed other cases," *id*., and awarded 4 percent, the prime interest rate on the date of the protective decree beginning the BLMIS SIPA liquidation.  Accordingly, I award prejudgment interest at a rate of 4% from November 12, 2010 through the date that judgment is entered.

## IV.   <u>Conclusion</u>

For the foregoing reasons, the Trustee's motion for summary judgment is GRANTED and Defendants' motion for summary judgment is DENIED.  The Trustee is entitled to judgment in the amount of $1,015,000.  The Trustee is also entitled to prejudgment interest at a rate or 4%, from November 12, 2010 through the date that judgment is entered.  The Clerk of Court is

respectfully directed to enter judgment for the Trustee, close the open motions on the docket, and

to close this case.

SO ORDERED.

Dated: June 13, 2024
       New York, New York

Vernon S. Broderick
United States District Judge